## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

—————————————

EDWARD FRIEDLAND,

      Plaintiff,

v.                                      Civil No. 03-1302 WJ/RHS

NATIONAL ACADEMY OF SCIENCES and
CONNECTICUT GENERAL LIFE INSURANCE CO.,
D/B/A CIGNA HEALTHCARE,

      Defendants.

## MEMORANDUM OPINION AND ORDER
## DENYING PRELIMINARY INJUNCTION

THIS MATTER comes before the Court following a hearing on the matter on December 3, 2003.  The Court entered a Temporary Restraining Order on November 13, 2003 (Doc. 4), requiring Defendants to resume payment for at-home nursing services needed by Plaintiff Friedland. The injunction was extended on stipulation of the parties while they engaged in limited discovery and settlement discussions. The parties presented evidence at the hearing, from which I make the following findings of fact and conclusion of law that preliminary injunctive relief shall be denied. See Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234, 1244-45 (10th Cir. 2001)(at the time a Court enters a preliminary injunction, it is required to make findings of fact and conclusions of law).

## BACKGROUND[1]

Plaintiff Friedland is a 66 year-old quadriplegic who, at the age of 27, was diagnosed with Charcot-Marie-Tooth Disease, a peripheral nervous system disease characterized by muscular

---

[1]  The Court takes notice of, and incorporates the parties' stipulated facts into its discussion.

atrophy.  Plaintiff was a scientist at the National Academy of Science ("NAS"). He is described as

a person of "keen intelligence," who has enjoyed and still enjoys life in spite of his debilitating

medical condition. He now experiences complete paralysis of limbs and respiratory failure.

Plaintiff has been on a ventilator for the past 25 years, and has received skilled nursing treatment

24 hours per day. He depends on this care for everything from monitoring and adjustment of the

ventilation equipment, transfers from wheelchair to bed, and for help with all activities of daily

living. In March, 2003, allegedly without prior notice, Defendant CIGNA Health Care

("CIGNA") denied payment of health services for Dr. Friedland.  He now seeks a Court Order

against Defendants to require them to continue reimbursement of his home health care expenses.

When Dr. Friedland initially participated in the NAS disability medical plan, the plan was

insured and administered by Equitable.  NAS changed insurers in January, 1992, switching both

plan administration and insurance from Equitable to Blue Cross and Blue Shield of the National

Capital Area ("BCBSNCA"). A dispute regarding the extent of coverage for nursing services

under the BCBSNCA policy was resolved by the 1993 Agreement between Dr. Friedland, NAS

and BCBSNCA. The Agreement contained a notice provision proposed by Dr. Friedland's

attorney.  The Agreement also states that benefits "provided by BCBSNCA. . . shall be counted

against Friedland's $1,000,000.00 Lifetime Maximum Benefit under the Group Contract."

BCBSNCA administered Dr. Friedland's benefits until its group contract with NAS ended on

December 31, 2002.

As part of this lawsuit, Plaintiff contends that he did not receive notice of termination of

benefits as required under the 1993 Agreement.  Two letters sent to Plaintiff are relevant on this

issue, although the parties do not agree on their significance.  On September 24, 2002, NAS sent

Dr. Friedland a letter regarding his eligibility under the NAS Comprehensive Health Insurance

Plan and Retiree Welfare Plan. The letter basically informed Plaintiff of his eligibility to extend his benefits coverage under COBRA after age 65, subject to the $1 million lifetime limit. Ex. 11. Three months later, ostensibly in response to requests for information made by Plaintiff's attorney, NAS sent a letter to Dr. Friedland advising him that his coverage would not end when he turned 65, but instead was governed by the limits in the 1993 Agreement. The letter also stated that Plaintiff would not be eligible for health insurance benefits under the NAS Retiree Welfare Plan because he did not meet the plan's definition of a retiree. Ex. 15.

On January 1, 2003, CIGNA replaced BCBSNCA in administering NAS' benefits plan. Before the starting date of the CIGNA contract, CIGNA was informed by BCBSNCA of Dr. Friedland that he was approaching a $1 million lifetime benefit maximum.  In early January, 2003, CIGNA had discussions with Mrs. Friedland regarding Dr. Friedland's insurance.  At that time, CIGNA believed Dr. Friedland was about $75,000 away from the $1 million maximum. CIGNA believed Dr Friedland's expenses reached $1 million as of March 26, 2003.  An Explanation of Medical Benefits form was sent to Dr. Friedland.  This form indicated that charges in the amount of $2,125.37 had exceeded the lifetime maximum benefits, and provided information regarding appeal rights. Ex. 2, Memo. in Supp. of Application for TRO.  The parties' pleading captioned "Stipulated Facts for Hearing on Preliminary Injunction" include copies of correspondence between NAS and Dr. Friedland or his attorney.

**Legal Standard**

In order for a preliminary injunction to issue, the moving party has the burden of establishing:  (1) substantial likelihood that the movant will eventually prevail on the merits;  (2) a showing that the movant will suffer irreparable injury unless the injunction issues;  (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may

cause the opposing party;  and (4) a showing that the injunction, if issued, would not be adverse

to the public interest. Lundgrin v. Claytor, 619 F.2d 61, 63 (10th Cir.1980).

If a movant demonstrates the last three requirements, the first factor becomes less stringent.

Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234, 1246 (10th Cir. 2001).  Instead of

showing a substantial likelihood of success, the party need only prove that there are questions

going to the merits "so serious, substantial, difficult, and doubtful as to make the issue ripe for

litigation and deserving of more deliberate investigation."  Id. at 1246-47.

**Likelihood of Success on Merits**

In order to satisfy the first requirement for injunctive relief, Plaintiff must show that he can

prevail on the merits. The parties seem to agree that the 1993 Agreement governs.  Plaintiff

concedes that the $1 million lifetime maximum still applies, and also that when NAS entered into a

new contract with CIGNA, the BCBSNCA contract became inoperative. Memo. in Sup. of

Application for TRO, at 10.  However, he also argues that the switch to CIGNA started the $1

million maximum over again.  This cannot be a fair reading of any of the provisions in the 1993

Agreement by any stretch of the imagination.  The 1993 Agreement expressly states in

unequivocal terms that Dr. Friedman's eligibility for benefits "cease"if either "the Group Contract

or this Agreement is terminated for any reason." Ex. 6, ¶ 8.  See Santa Fe Technologies v. Argus

Networks, Inc. et al., 131 N.M. 772, 788 (Ct.App. 2002)  (A court will not rewrite a contract for

the parties and, in its interpretation, the court will apply the plain meaning of the contract

language).[2] With the 1993 Agreement inoperative, Friedman would then be left only with the

_____

[2]  The September 24, 2002 letter sent to Dr. Friedland notes that: should the National
Academies choose another health insurance carrier, claims against an employee's lifetime
maximum are carried forward with the new insurance carrier and you would not be entitled to
start a new lifetime maximum." Ex. A, Diller Decl.

express terms of coverage available under NAS' health care policies, from which Plaintiff would be excluded because of his age. See Ex. 16; see also, Straub v. Western Union Telegraph Co., 851 F.2d 1262, 1266 (10th Cir. 1988); Miller v. Coaster Corp, 978 F.2d 622, 624 (10th Cir. 1992) (no liability exists under ERISA for purported oral modifications of the terms of an employee benefit plan). On the other hand,  the 1993 Agreement governs, and if the $1 million maximum has been reached -- which Plaintiff disputes, Dr. Friedland would not be eligible for continued reimbursement under the Agreement, despite obvious difficulties he will undoubtedly face regarding placement and payment for health care services.

In looking at the first factor for injunctive relief, I find it necessary to narrow the "merits" of this case down to the issues relevant to injunctive relief.  Dr. Friedland argues both that he did not receive the required notice under the 1993 Agreement, and also challenges CIGNA's belief that the $1 million was reached.  However, the real issue in this case is whether Dr. Friedland can show that he is entitled to continued reimbursement for home health care expenses. Peeling through the layers of notice and an accounting of expenditures, at bottom is Dr. Friedland's very understandable desire to continue receiving care at home.  On that issue, based on the documents and other evidence submitted, and the testimony presented at the hearing, I find that Dr. Friedland cannot make the minimal showing that there are questions going to the merits so "serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."

Plaintiff's inability to show substantial likelihood of prevailing on the merits allows the Court to forego the rest of the factors. See e.g., Sprint Spectrum, L.P. v. State Corp. Com'n of Sprint Spectrum, L.P. v. State Corp. Com'n of State of Kan., 149 F.3d 1058 (10th Cir. 1998) (finding it unnecessary to address irreparable harm factor because the first- substantial likelihood

of prevailing on the merits-clearly supported the denial of the preliminary injunction). However, given the fact that other issues exist in this case, I continue the analysis.

Notice Issue:

The notice provision in the 1993 Agreement stated that NAS was required to give Plaintiff 180 days notice "before such changes [of carriers and/or policies] become effective") Plaintiff argues that if notice wasn't given, the provision governing termination was not triggered. Ex. 6, ¶ 7. Dr. Friedland considered the September 24, 2002 letter as a "notice of termination." Ex. 18.  In that letter, Plaintiff was notified that as a disabled plan participant, benefits under NAS Comprehensive Health Insurance Plan and Retiree Welfare Plan would cease upon his 65th birthday.  The letter also was a reminder that benefits could be extended through COBRA, but subject to a $1 million lifetime maximum benefit. Ex. 11.  In the December 4, 2002 letter that followed Plaintiff's inquiries, NAS corrected the information sent by way of the September letter, advising Dr. Friedland that the 1993 Agreement governed his health benefit coverage.[3]  I recognize that there may have been some confusion generated by the two letters sent to Dr. Friedland in September and December of 2002, particularly since there is also some question about whether Plaintiff and his attorney have received documentation of the total amount of benefits paid out under the 1993 Agreement. Also, considering the inquiries that were made by Plaintiff or his attorney to NAS after September to clarify Plaintiff's situation, these letters may be somewhat wanting in terms of exact notice to Plaintiff, and may not have necessarily provided "complete and accurate information" as envisioned under ERISA.[4]  See Krohn v. Huron Memorial

---

[3]  Since the Agreement allowed for a $1 million lifetime maximum, without consideration of Plaintiff's age, it could fairly be said that COBRA coverage would not have extended Plaintiff any further benefits than the 1993 Agreement.

[4]  Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 to §1461.

<u>Hosp</u>. 173 F.3d 542 (6th Cir. 1999) (Once an ERISA beneficiary has requested information from an ERISA fiduciary who is aware of the beneficiary's status and situation, the fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance, even if that requires conveying information about which the beneficiary did not specifically inquire).

Yet these questionable notice deficiencies do not warrant issuance of a preliminary injunction.  Injunctive relief is preferable to damages only when money cannot make one whole. <u>See</u> <u>Savage v. Gorski</u>, 850 F.2d 64, 68 (2d Cir.1988) ("Since reinstatement and money damages could make appellees whole for any loss suffered during this period, their injury is plainly reparable and appellees have not demonstrated the type of harm entitling them to injunctive relief"); <u>Starlight Sugar, Inc. v. Soto</u>,114 F.3d 330 (1st Cir. 1997)(recognizing that it injunctive relief is generally inappropriate where money damages can make a plaintiff whole); <u>Acierno v. New Castle County</u>, 40 F.3d 645 (3rd Cir. 1994).

In this case, injunctive relief is not the appropriate remedy. Under the 1993 Agreement, Plaintiff was entitled to 180 days notice to any change in benefits, during which time Dr. Friedland could investigate other options to continue his health care. Injunctive relief would essentially "buy" Plaintiff 180 days from the time before his benefits were cut off.  Even if he was not afforded 180 days notice by the letters in September or December, 2002, Plaintiff most certainly has had over 180 days notice from the time in March, 2003, when CIGNA denied requests for payment. Because Plaintiff has paid out his own health care expenses during that time, money damages covering March to September, 2003 – and not injunctive relief – would make Dr. Friedland whole on the notice issue.

**Irreparable Harm**

Plaintiff's ability to show irreparable harm is also tenuous.  In the cases cited by Plaintiff,[5] irreparable harm was evident because those plaintiffs would be bereft of *any* care.  Here, the question is whether placement outside the home is sufficiently detrimental so that CIGNA should be ordered to continue payments until a trial on the merits.  I find that it is not.  Dr. Friedland's treating physician, Dr. Vaughan, testified as to the benefits of the care Dr. Friedland has been receiving, and about Plaintiff's specific medical needs, such as respiratory and ventilatory support, in addition to the details of daily care he needed. He was also questioned on alternative facilities, such as acute care facilities and long-term acute care facilities, and stated that a comparable level of care could probably be found at a long-term acute level care facility, although that type of facility was usually directed toward patients with an eye toward progressive rehabilitation and eventual discharge.[6]  He testified to possible exposure to nosocomial infections (infections that occur within hospital settings and which are notoriously resistant to antibiotics), which Dr. Friedland would face in a hospital, and the possible lack of continuity of caregivers in that setting because of staffing needs.

Weighing all of Dr. Vaughan's testimony about the pros and cons of home care and care in an alternate facility such as a long-term acute care facility, and recognizing that home care has advantages not available in outside facilities, I nevertheless do not find that the less desirable aspects of such outside placements constitutes irreparable harm. While Dr. Vaughan stressed the

---

[5] See, Memo. in Supp. of Application for TRO, page 7: Velez v. Prudential Health Care Plan of N.Y., 943 F.Supp. 332, 343 (S.D.N.Y. 1996); Mattive v. Healthsource of Savannah, Inc., 983 F.Supp. 1559, 1564 (S.D.Ga. 1995).

[6] Mrs. Friedland testified that she was told that her husband would not be eligible for Medicaid because of their income, she had not yet investigated Dr. Friedland's admission into a long-term acute care facility.

importance of family participation and concern, he also mentioned that patients who did best in long-term acute care facilities were those with strong family involvement.

**Last Two Factors**

CIGNA's position on the last two factors concern the outlay of costs and expenses that it will never recoup should it be ordered to take up payments for Dr. Friedland's health care. Defendants also urge the Court of the importance of ERISA plan participants as well as plan providers having some certainty and sense of reliance in the terms of the health plans that are provided.  However, having made determinations on the first two factors in the inquiry, I need go no further.

**THEREFORE**,

**IT IS ORDERED** that Plaintiff's Motion for a Preliminary Injunction (**Doc. 2**) is hereby DENIED;

**IT IS FURTHER ORDERED** that the Temporary Restraining Order entered by the Court on November 13, 2003 (**Doc. 4**) is hereby lifted.

_____
UNITED STATES DISTRICT JUDGE